PETER J. D'AMICO, PETITIONER-RESPONDENT, v. GEN-
ERAL ELECTRIC SUPPLY COMPANY, A CORPORATION,
RESPONDENT-APPELLANT.

Essex County Court
Law Division

Decided November 30, 1951.

*Messrs. Roskein and Laird,* attorney for petitioner-appellee (*Mr. John A. Laird,* of counsel).

*Messrs. McCarter, English and Studer,* attorney for respondent-appellant (*Mr. Verling C. Enteman,* of counsel).

NAUGHRIGHT, J. C. C. Respondent, General Electric Supply Company, appeals to this court from an award entered in favor of petitioner, Peter D'Amico, by the Division of Workmen's Compensation of the Department of Labor and Industry.

The issues presented by this appeal are: (1) whether petitioner met with an accident arising out of and in the course of the employment; (2) whether the assessment against respondent-appellant for the medical and hospital bills incurred by petitioner was proper.

Petitioner had been in the employ of respondent-appellant for about two years, and on the date of the alleged accident, March 11, 1949, and for about a year prior thereto, had been working for them as a receiving clerk. His duties in this latter capacity consisted of unloading packages and cartons

from trucks at the company warehouse and keeping accounts or records of the materials as they came in.

On March 11, 1949, petitioner reported for work at his usual time, 8:45 A. M. He began unloading some cartons and packages containing mixing bowls from the tailboard of the truck (which was about shoulder high) onto a pallet or flat platform about four inches off the ground.

Petitioner would remove these cartons (each weighing about six pounds) and with a twisting motion of the body lower them onto a pallet. About 10 A. M., as he was lowering three of these cartons, which he held in such fashion that with arms extended he was pressing the two outer cartons together so as to hold the middle carton in place and keep it from falling, he felt a sharp pain go up the entire left side of his body, front and back. He began to sweat, experiencing a heaviness in breathing. He described the pain as a sort of binding and biting pain in his chest.

Petitioner removed the few remaining packages from the truck and then reported to his foreman, a Mr. Edward O'Connor. He complained of a pain in his left side and told Mr. O'Connor that he had thought he "pulled" a muscle. Mr. O'Connor sent him to the company doctor where he was given heat treatments on his left side by one of the nurses and told to report back on Monday.

Returning to the company plant about noontime petitioner performed but light, sedentary work for the balance of the afternoon. He went directly home after work and, feeling too sick to eat, went to bed. He was not able to sleep well or move properly, being bothered by the pain in his left side and chest.

Dr. Samuel Fortunato, who had treated petitioner in the past, was called in the next day. The doctor gave petitioner something to relieve the pain and advised him to see him at his office on Monday. Dr. Fortunato examined petitioner at his office that Monday, March 14, 1949, and suggested that an X-ray be taken. X-rays were taken that night by a Dr. Santora.

As a result of Dr. Fortunato's examination of these X-rays, petitioner was sent to the hospital, Thursday, March 17, 1949, where he remained for two days. While at the hospital petitioner was examined by a Dr. Martin Castellano, a specialist in chest diseases, who had been called in for a consultation by Dr. Fortunato. Dr. Castellano observed that petitioner appeared short of breath, looked pale and seemed to have some pain in his left chest. He found, upon examination, that the breath sounds on the left side were absent and that on percussion the lower left chest was flat. The heart was pushed to the right side. Dr. Castellano said that an examination of the X-ray plates taken by Dr. Santora showed that the left lung was approximately 50 per cent collapsed and that there was a fluid filling practically half of the left chest.

Petitioner left the hospital on Saturday, March 19, 1949, and went to Dr. Castellano's office where his left lung was "tapped" by Dr. Castellano for removal of this fluid. The fluid removed was a bloody fluid. Petitioner was "tapped" or aspirated for fluid about six or eight times in all, and on each occasion a bloody fluid was removed. The last "tapping" or aspiration took place on April 29, 1949.

The reason for the removal of the fluid, as Dr. Castellano explained, was that if it were to remain it would cause the pleura to thicken and encase the lung in an elastic membrane, impairing its function. In such condition, the lung could not expand properly.

As a result of fluoroscopic examinations and X-rays it was Dr. Castellano's opinion that petitioner was suffering from a spontaneous pneumothorax (collapse of lung) with fluid in the chest.

It appears from the medical testimony that petitioner had a cyst or bleb on his left lung, which condition pre-existed the incident of March 11, 1949; and that with each effort or exertion air was pushed into the cyst or bleb causing it to thin out until, upon the occasion in question, it tore or burst, causing air and fluid to flow into the lung, collapsing it. The hemorrhaging that accompanied this tearing or

bursting was apparently due to the presence of a blood vessel within the bleb or cyst which ruptured upon the breaking of the cyst or bleb.

On May 20, 1949, petitioner, while still under the care of Dr. Castellano, was examined by a Dr. Anthony Crecca, a specialist in thoracic surgery. This examination was made at the request of respondent's insurance carrier.

Dr. Crecca's findings as a result of X-rays and a physical examination were a chronic hydropneumothorax with the left lung collapsed almost 50 per cent and the vital capacity little better than 50 per cent of total vital capacity. The doctor also found an accumulation of fibrous tissue in the thorax, preventing re-expansion of the lung. Dr. Crecca felt petitioner should undergo surgery to re-expand the lung and so informed respondent's insurance carrier.

Dr. Crecca again saw petitioner at the request of Dr. Castellano, at which time he (Dr. Crecca) suggested an exploratory to remove scar tissue so as to permit the lung to re-expand as much as possible.

Petitioner was sent to the hospital on July 19, 1949, for an operation by Dr. Crecca for the removal of this fibrous tissue that had enveloped the lung and interfered with its proper expansion. As a result of the operation the lung had re-expanded, although both Dr. Crecca and Dr. Castellano believed that petitioner had sustained a disability in spite of such re-expansion.

Petitioner's present complaints are that he cannot run or lift anything and that he gets pains when the weather changes. He complains also of a heaviness in breathing and inability to wear anything too tight without irritation and pain.

Petitioner received two weeks' wages after the accident and from April 1, 1949, until October, 1949, received disability benefits under the State Sickness Law at the suggestion or procurement of respondent-appellant. Petitioner returned to work in October though he was unable to resume the duties he had performed before the incident or alleged acci-

dent of March 11, 1949. He now does work of a light, sedentary nature.

It is contended by respondent-appellant that petitioner has not borne the burden of proving that he met with a compensable accident. In this connection two inquiries must be made: (1) Under the facts of this case was it incumbent upon petitioner to prove that his disability resulted from unusual strain or exertion incident to the employment? (2) Does the medical testimony support a finding of causal relationship between petitioner's condition and the lifting effort of March 11, 1949?

I. Respondent-appellant urges this court to adopt the doctrine of "unusual strain or exertion" as laid down in the heart cases, on the ground that the facts of the instant case are so closely analogous to the heart cases as to be indistinguishable from them. The rationale of the heart cases, it argues, rests upon the presumption that the disease is most often the result of natural physiological causes and that to relate the disease to the employment some unusual strain or exertion must be proved. Respondent-appellant contends that inasmuch as no marked effort or strain was necessary to bring about the bursting of the cyst or bleb causing the pneumothorax, and that as it could have occurred at any time, unusual effort or strain should, as in the heart cases, be required.

Respondent-appellant concedes that the Appellate Division of our Superior Court has said, in the case of *Neylon v. Ford Motor Co.*, 13 *N. J. Super.* 56 (1951) and the case of *Mills v. Monte Christi Corp.*, 10 *N. J. Super.* 162 (1950), that the doctrine of "unusual strain" has not been extended beyond the heart disease cases. It contends, however, that the case at bar is clearly distinguishable from these cases, as the *Neylon* and *Mills* cases involved back injuries resulting from trauma or effort—in the *Neylon* case a sacroiliac sprain and in the *Mills* case a herniated disc. Thus the court in those cases, it is advanced, were not troubled by the question of whether the heart doctrine ought to apply since they were dealing

with injuries the result of trauma or effort and not those more often the result of natural physiological causes.

Whatever merit there may be in such contention, the case at hand seems to be controlled by the decision of the Appellate Division of our Superior Court in the case of *Fox v. Plainfield,* 10 *N. J. Super.* 464 (1950). In the *Fox* case a city fireman sustained a cerebral hemorrhage while fighting a fire. He had been predisposed toward the disability, suffering from high blood pressure, "hypertensive cardiovascular disease," for a considerable time. It had been urged by the respondent-appellant in that case, as it has been urged by respondent-appellant here, that the fireman had been predisposed to the disability by a pre-existing diseased condition and that it could have occurred while he was at home reading the newspaper. The court said at *page 469* :

"The legal result is of course not affected by the fact that Fox was suffering from a pre-existing diseased condition of his blood vessels and arteries which predisposed him to cerebral hemorrhage * * * nor by the fact that the hemorrhage might have occurred at any time due to the natural progress of the pre-existing disease."

The court went on to say that the argument of appellant that the doctrine of "unusual strain or exertion" in heart cases is applicable and that the lack of proof of special effort as a precipitating cause of the hemorrhage precludes an award to the petitioner, is not well founded. It is thus quite evident that the same argument as appellant herein propounds had been considered and disposed of by the court in the *Fox* case.

The refusal or reluctance of the court to make any distinction between injuries the result of effort and injuries more often the result of natural causes, in arriving at a determination of the degree of effort that must be shown, is apparent from the foregoing statement of the court: "This doctrine has apparently not been extended beyond the heart cases. See *Mills v. Monte Christi Corp.,* 10 *N. J. Super.* 162 (*App. Div.* 1950)."

 It is not perceived that any valid distinction can properly be drawn between the *Fox* case and the case at hand. Accordingly, this court finds that the doctrine of "unusual strain" is inapplicable. A showing of ordinary strain or effort is sufficient.

II. Respondent-appellant alleges that there is no proof whatsoever that a causal relationship existed between the lifting episode of March 11, 1949, and petitioner's condition and that the medical testimony shows that petitioner is not now suffering from any permanent disability. The preponderance of the medical testimony is to the contrary. Dr. Castellano, who had treated petitioner from March 18, 1949, to October 13, 1950, testified that in his opinion there was a direct causal relationship between the lifting incident of March 11, 1949, and petitioner's disability. The fact, as Dr. Castellano's testimony indicated, that there was a tear in the cyst and not just a leak, together with the fact that the symptoms of pain, sweating, heaviness of breathing followed immediately the lifting incident of March 11, 1949, makes it extremely difficult to say that the lifting effort was not an efficient producing cause of the pneumothorax.

Dr. Crecca, who testified on behalf of petitioner, said that he would not call petitioner's condition a spontaneous pneumothorax where there is evidence that petitioner had a pain due to an accident which caused this pneumothorax. The word "spontaneous," he said, indicates no particular cause—"an idiopathic thing in which the person who uses it describes no real pathology." The diagnosis, he said, in this case should have been traumatic hydropneumothorax because there was a tearing of the lung cyst.

Dr. Saul Lieb, an internist, who examined petitioner November 6, 1950, testified in response to a hypothetical question as to causal relationship between the lifting and petitioner's disability as follows:

"The type of work he was doing would be a competent producing cause * * * because as the result of this there was a tear produced

in the lung with resulting escape of air and bleeding into the left pleural cavity and collapse of the left lung, subsequent and resulting clotting of the blood in the pleural cavity with the production of adhesions."

His findings were a pulmonary disability due to fibrous changes within the left thorax. The disability he estimated as 20 per cent of total permanent disability.

Dr. Lieb said that the pneumothorax was not spontaneous in this case and the fact that it may occur spontaneously does not rule out the fact that although it may be labelled as such in cases such as these, it may nonetheless follow after effort. It could follow effort and still be labelled "spontaneous."

Dr. Lieb said that a pneumothorax of this type can and often does occur after effort and that the majority could be related to some type of exertion. The doctor also testified that where a man is expending a certain amount of effort and directly thereafter gets a pain in the chest and shortness of breath and later it is found he sustained a pneumothorax it is difficult to dissociate that particular pain or shortness of breath representing a pneumothorax from the pre-existing effort.

The medical testimony of respondent-appellant is largely based upon the supposititious circumstances under which petitioner could have sustained this disability. It should be pointed out that the primary task of this court is to determine whether under the circumstances here exhibited, respondent had properly established by a preponderance of the probabilities, his claimed right to compensation. *Ciecwirz v. Public Service*, 128 *N. J. L.* 16 (*Sup. Ct.* 1942).

Respondent's medical testimony is that no causal relationship existed because (1) petitioner had been engaged in this same kind of work for about a year without having any untoward effects; (2) that the physical exertion just prior to the development of the symptoms was no greater than he had been accustomed to do; (3) that there is recognized medical data to show that a collapse of the lung similar to

that which petitioner sustained, occurs at rest and without exertion.

Respondent's physician, Dr. Samuel Cohen, specialist in chest diseases, when asked whether pressure or light effort could have ruptured the bleb if it were at that particular point of tension where only a small amount of effort would be necessary to break it, replied that it was within the realm of probability, though he doubted it.

It seems quite clear that the medical testimony supports a finding that petitioner has proved by the preponderance of the probabilities that he met with an accident arising out of and in the course of his employment.

The medical testimony further shows that petitioner has sustained a partial permanent disability and the finding of the deputy director that the partial permanent disability was 15 per cent of total is amply justified by the record. The medical testimony of petitioner, based on his present complaints and the findings made from various physical examinations, X-rays and the like, show that in his present condition, while his lung has re-expanded fully, he was left with a thickened pleura (a disabling condition), elevated diaphragm and adhesions. The finding that these were permanent disabilities is justified.

This brings up the final issue for consideration—the question as to the authorization for medical bills and expenses which were assessed against respondent-appellant. Respondent-appellant contends that petitioner had not requested or received authority from respondent under *R. S.* 34:15–15 to incur hospital, doctors' and nurses' bills, and that the treatments were not emergency ones.

The evidence shows that respondent-appellant, through its foreman, Mr. O'Connor, had been regularly advised by petitioner's father of petitioner's progress, of the fact that he was hurt on the job and was in pain, of the fact that he was being hospitalized on March 17, 1949, and of the fact that he was to be operated on. Respondent-appellant was well aware of petitioner's condition, of his need for medical treat-

ment and surgery. In fact, respondent's own insurance carrier requested Dr. Crecca to conduct a medical examination. It seems inconceivable that respondent should disclaim any knowledge of petitioner's condition or that it arose during the course of his employment.

Having neglected to provide such treatment as was indicated, it seems that the reasonable medical expenses are properly chargeable to it. See *Donofrio v. Haag Bros., Inc.,* 10 *N. J. Super.* 258 *(App. Div.* 1950); *R. S.* 34:15–15 *(par.* 2).

Respondent-appellant makes much of petitioner's failure to ask for medical treatment. It argues, in effect, that it would have supplied medical aid to petitioner had it been requested. Yet the attitude it now adopts, through its answer, is that it had no knowledge of the occurrence of any accident, entering a general denial of liability.

Certainly the implication of respondent-appellant's answer is that it disavowed responsibility for medical care and considered it would not have been obligated to furnish any, even if it had been requested. See case of *Bobertz v. Hillside,* 126 *N. J. L.* 416 *(E. & A.* 1941). How, then, can it make a point of the omission of a request for medical services when its answer indicates that a request would have occasioned no difference in its attitude and would have been unavailing?

The medical expenses are fair and reasonable and are properly chargeable to respondent-appellant.

The appeal will be dismissed and the judgment below affirmed.