37 N.J. Super. 19 (1955)
116 A.2d 818
WILLIAM W. BOWEN, PETITIONER-APPELLANT,
v.
SAMUEL OLESKY, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 7, 1955.
Decided September 23, 1955.
*20 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. John E. Neville argued the cause for petitioner-appellant.
Mr. Isidor Kalisch argued the cause for respondent-respondent.
The opinion of the court was delivered by CLAPP, S.J.A.D.
Appeal is taken from a judgment of the Essex County Court denying petitioner workmen's compensation *21 and reversing the Workmen's Compensation Division. The Division had awarded him compensation.
Petitioner's claim is based on a severe assault upon him committed by some one for some purpose not clearly apparent. The sole question we shall deal with, primarily a factual question here, is whether the assault arose out of the employment.
He had, at the time of the assault, been in respondent's employ as a butler, houseman and chauffeur for 20 months, living in the employer's house. The Saturday night and the Sunday (he had the Sunday off) prior to the assault, he had spent at the home of a married woman whom he referred to, in his statement to a policeman, as his girl friend.
He testified he returned to his employer's home at 11:15 P.M. that Sunday, and after hanging his clothes neatly in the closet, went to bed and to sleep. His story on the stand was that the next time he was aware of his whereabouts was the following Tuesday night when he "came to," "regained consciousness" in the hospital. He claims his "watch was taken off," his "ring [was] taken off [his] finger," and his keys and wallet or wallets containing $60 were missing.
The employer's wife testified that on Monday morning when petitioner was found in bed, there was a lot of blood in his room  in the bed, on the floor near the bed and on two walls of the room, with some blood spattered on the wall up to about one foot from the ceiling. A captain of the police force said the wall and the mattress on the bed were saturated with blood. Petitioner's trousers, shirt, jacket and overcoat were lying on the floor, as though thrown there, but without any blood on them. A bloody handkerchief lay near his bed. No blood was found outside his room except for a little in the bathroom to which he apparently went Monday morning.
All this indicates that he was assaulted while in his room and after he had taken his clothes off. His injuries consisted of a fractured skull  a long fracture running from the frontal region to the base of the skull  a rupture of one eyeball and lacerations, injuries that confined him to the hospital for 4 1/2 weeks.
*22 Petitioner's contention before us is that he was the victim of an assault by some one who had entered his employer's home to rob the employer or his family. The theory is that the thief, coming up the kitchen stairs, by accident got into a servant's room in the servant's hallway (a front staircase led to the family hallway). As evidence of the intruder's motive, petitioner points to the theft of his wallets and other articles mentioned. On the other hand, it may be noticed here, the intruder entirely disregarded everything else in this rather pretentious house.
The critical question is whether in endeavoring to establish this theory, the petitioner has sustained the burden of proof. The County Court held he had not done so. Much stress is put by the employer upon discrepancies in the stories petitioner told on the Monday morning following the assault as to the cause of his injuries. But these discrepancies we think are not too damaging to petitioner's case. On that Monday morning he told the laundress at the house, later the employer's wife and thereafter a policeman that his injuries were due to a fall. At the hospital he told his attending physician that he did not recall how the accident happened, but he thought he was hit outside of the house. Neither of these stories can be accepted.
Petitioner claims he does not remember talking to these persons. It could well be that the severe blow he received on the head brought about a loss of memory as to what he said concerning a fall or being hit outside the house; being confused that morning, he may have been floundering about for an explanation of his predicament.
We are, however, a little more disturbed by other aspects of the conversation he had with the policeman that Monday morning. There were about ten minutes of questioning by the officer, to which petitioner answered repeatedly that he did not know. Then, asked to give his sister's address, petitioner said his address book was in his wallet, which the officer found to be missing.
Petitioner then somehow discovered, and told the officer, that his other wallet, watch, ring and keys were missing. *23 It is a little surprising that his memory is gone as to this portion of the conversation which must have required some intelligent consideration on his part and would, it would seem, be quite apt to have reached his full consciousness. He told the policeman at the same time the name and address of his girl friend, at least the name of his sister, that he had been at the girl friend's the day before and that "he had had a few drinks" there (at the trial, he said it was a couple of glasses of beer on Sunday). He also answered questions asked of him by the employer's wife. Furthermore, at the hospital he was conscious and answered questions.
Did he really, then, suffer a loss of memory as to everything that happened Monday morning; or was he trying, as the employer claims, to avoid having to explain the statements he made that morning? There are other troublesome questions. Was the assault, as the employer urges, undertaken for some vindictive, personal purpose unconnected with the employment? And was the theft of the wallet and other articles "but an incident" (cf. Cole v. I. Lewis Cigar Mfg. Co., 3 N.J. 9, 15 (1949)), of this purpose? The facts by no means establish such a purpose, but they raise a question.
Nothing in the record, it may be noted, seems to indicate that the police concluded that the purpose of the intruder was to rob the employer's home. On the contrary, they asked petitioner whether he was suspicious of anybody; and when told by him that there was a maid at the employer's house who was jealous of petitioner's girl friend, they checked out that clue, but without result. They also verified, to their satisfaction, petitioner's statement that his girl friend's husband was in jail. Later they dropped the investigation.
The question whether the intruder's motive was personal revenge, lengthens as we take into account other circumstances. For one thing, petitioner's injuries were so very severe as to indicate that the intruder wanted to inflict punishment on the petitioner, and not  in order to perpetrate a theft  merely to silence him because (as was said by his counsel on the argument) he was stirring in his sleep.
*24 Moreover  notwithstanding petitioner's testimony that he never had had any one in his bedroom at the employer's house  the cook there testified that at 5:00 A.M. on the Wednesday before the assault, she (judging from sounds) thought two persons left his bedroom going downstairs and that one (perhaps the petitioner) immediately returned. It might be noted at this point that quite a few months after the accident a woman's underpants were found in the clothes basket in the closet in his room which had apparently not been in use since he had left for the hospital. He denied any knowledge of the garment.
Furthermore, a chemical toxicologist testifying for the employer, who examined petitioner's room 7 1/2 months after the assault, found blood on all four walls and also on the ceiling. If petitioner had been lying in bed when hit, this blood would have had to spurt some 12 to 15 feet. The expert claimed this to be very unlikely. The indication was, he said, that the blood came from a man standing up or, rather, moving about. In other words, his opinion was that petitioner had probably been engaged in a scuffle. If that were so, it seems to us more likely than not, that petitioner may have remembered it or some connection with it and hence would now know much more as to the assault than he is willing to admit.
We should notice too that there were hitches in the flow of petitioner's testimony on cross-examination at several critical points, something that does not appear at other points:
"Q. Did you talk to any police officers the following morning? * * * A. I don't remember talking to any policemen or anyone else on Monday morning. I don't know anything. I don't know what happened on Monday morning.

* * * * * * * *
Q. Didn't you tell Mrs. Olesky that you had fallen down in your room? A. If I did, I wouldn't know anything about it. I won't say that I did or I won't say that I didn't. If I told her that I don't remember telling her that.

* * * * * * * *
Q. * * * Can you tell us, Mr. Bowen, how it happened that there was an article of woman's underwear found in your room after *25 this accident? A. No, sir, I don't know anything about it. I don't know anything about any woman's underwear found in my room. I wouldn't know anything about it.

* * * * * * * *
Now, Mr. Bowen, did you use a handkerchief or any other article or piece of clothing or anything else to stop the bleeding that occurred? A. I didn't know anything about the bleeding. I didn't know nothing. The first thing I remember was Tuesday night. I don't know anything about bleeding or anything else.
Q. Did you cry out or did you see anybody? A. I didn't see nobody. I didn't see nobody and I didn't even feel the blow."
We have endeavored, to the extent we think required by the law, to apply the Workmen's Compensation Act, R.S. 34:15-1 et seq., N.J.S.A., liberally to the circumstances before us. Sanders v. Jarka Corp., 1 N.J. 36, 42 (1948). But such advantage in that regard, as may be given a claimant when there is scant evidence as to just how or why he or his decedent was injured, Macko v. Herbert Hinchman & Son, 24 N.J. Super. 304 (App. Div. 1953), 1 Larson, Workmen's Compensation (1952), § 10.00, 10.31, 10.32, 11.33, will surely be extended to him very guardedly when there are substantial grounds for suspicion that he could, if he wished, add considerably to the proofs.
There is indeed something to be said for the theory supporting petitioner's case. On the other hand, in our view, there is quite as much to be said against it. We conclude that the case ends with a question mark; that the evidence, direct and circumstantial, supporting petitioner's theory, is not sufficient to sustain the burden of proof cast upon him. Green v. Simpson & Brown Construction Co., 14 N.J. 66 (1953); Bobertz v. Board of Education of Hillside Twp., 135 N.J.L. 555 (E. & A. 1947).
Moreover, petitioner has an added burden  which every appellant has  of showing error in the judgment under review  the County Court judgment here. Smith v. Mayor and Common Council of Newark, 33 N.J. Eq. 545, 552 (E. & A. 1881); Donofrio v. Haag Brothers, Inc., 10 N.J. Super. 258, 262 (App. Div. 1950); McGowan v. Peter *26 Doelger Brewing Co., 10 N.J. Super. 276, 281 (App. Div. 1950).
For failure to carry these burdens, the judgment of the County Court is affirmed.
FRANCIS, J.A.D. (dissenting).
It is difficult to disagree with my colleagues whose views are set down so dispassionately and who are fully aware of our duty to administer the Workmen's Compensation Act liberally to effectuate its beneficent purposes. I do so only because of a conviction that suspicion and conjecture have been permitted to outweigh the force of proven basic facts which, scant though they may be, justify an award of compensation.
Petitioner was furnished with a bedroom in the employer's home as part of his wages and so he would be "handy" to his work. Ordinarily his work ended around 8 P.M. after dinner. Occasionally his services were utilized in the evening. And he was required to go on duty for breakfast at 7 A.M.
Thus the use of the room may be described as an incident of his employment. If an intruder bent on stealing entered the Olesky home and by chance came upon Bowen, whether in his bedroom or anywhere else in the house, and assaulted him in an effort to escape or to consummate the burglary, there seems little doubt that compensation would be proper. Willner v. Katz, 4 N.J. Misc. 811 (Sup. Ct. 1926), affirmed per curiam 103 N.J.L. 698 (E. & A. 1927). The risk of encountering burglars would be considered incidental to occupancy of the room and so incidental to the employment. In my judgment, there is no proof here of sufficient probative force to take the injury out of that category.
Bowen came home at about 11:15 P.M. on Sunday, January 25, 1953. There is no substantial evidence of intoxication. He undressed, put his clothes away in the closet and went to bed. This seems to be beyond question because the next morning, when he was found in the injured condition, the clothes were thrown about the floor. However, every one agrees there was no blood on them, although it was spattered *27 on the bed, walls and floor. The inference is strong that the intruder went through the clothes and threw or dropped them on the floor. The testimony at the hearing was that after going to sleep, his next memory for events was finding himself in bed in the East Orange General Hospital some time on Monday morning. At that time he was suffering from severe head and eye injuries, consisting generally of a concussion of the brain, a long fracture of the skull running from the right temple to the base of the skull, and a rupture of the choroid of the right eye. Subsequent neurological examination indicated some brain damage, a "post traumatic cerebral syndrome with linear defect in the skull in the right frontal area, and an anxiety neurosis overlay."
According to Mrs. Olesky and the laundress, Bowen told them, after he was discovered in his injured condition in his room early Monday morning, that he had fallen. On seeing the state of the room, Mrs. Olesky realized that more than a mere fall was involved and called the police who appeared in a short time. The injured man told the officer also that he had fallen. However, the officer said that for about ten minutes Bowen could not talk to him. He kept moaning and groaning with the result that a second officer was sent for and arrangements were then made to remove him to the hospital.
At the hospital the day after admission, Bowen gave the treating physician a history that he could not remember what had happened but he thought he was hit outside the house. At the trial he said he could not remember talking to these various persons.
The overwhelming proof in the case demonstrated that the injury had not occurred outside the house. A search revealed no blood in the area of the servants' entrance or on the stairs or hall leading to petitioner's room. It was equally clear from the blood-spattered condition of the room that more than a simple fall had occurred. I agree with the majority that petitioner's seemingly inconsistent statements could well have resulted from the severe blow on the head and that they "are not too damaging to the petitioner's case."
*28 In my judgment, the preponderance of the evidence shows that Bowen was robbed. He claims the loss of two wallets containing $60, and his keys. He said also that a ring was taken from his finger and a watch from his wrist. Presumably he indicated that the latter was accomplished after he was rendered or became unconscious. The statement about the taking was made during the first conversation he had with the police and before his removal to the hospital. It appears also that after being discharged from the hospital he came to police headquarters and inquired as to the progress of their investigation.
The first maid to come downstairs on Monday morning felt cold air and found a kitchen window not only unlocked but open, and she closed it.
About 1 A.M. respondent's daughter had heard sounds in the kitchen area and she thought it was "either William Bowen or my brother coming home." She was expecting her brother and wished to speak to him, so she went into the upstairs foyer and waited for the light in the kitchen to go on. When it was not turned on, thinking that her brother might be having trouble with his keys, she went into his bedroom where she could see in the area of the rear entrance. Seeing nothing, she returned to her room and went to bed.
Her brother's bedroom was across the hall from Bowen's. It had two doors, one into this rear hallway and the other into the main upper hallway off which were the master bedrooms. So a person could walk from the rear hallway through the son's room to the main part of the house.
The evidence points plainly to an illegal entrance into the house. From the taking of Bowen's property, the purpose of such person would appear to have been theft. There is certainly no substantial proof that the intention was to steal from him alone. Reference is made to the fact that nothing else was taken from the house. But if Bowen awakened and was assaulted, and if a struggle ensued, as it most certainly did from the condition of the room, the burglar might well have been frightened off when Bowen finally fell or collapsed on his bed.
*29 Respondent insinuates that this might have been a personal assault because Bowen had a married "girl friend" in whose home he admittedly spent some part of the week-end. She was separated from her husband and the intimation is that perhaps he was the perpetrator of the assault. But the evidence is uncontradicted that Bowen had never met or seen him and that he was in jail at the time and there is nothing to indicate that he had sponsored the affair.
If the assault had been a personal, vindictive matter, the greater likelihood is that it would have taken place on the street, or outside the house, or in some place to which Bowen might come in his ordinary associations. It requires too much conjecture to conjure up the impression that a personal enemy would select this particular Sunday night for the attack, then take advantage of the coincidence that one of the kitchen windows was open, and then go directly to Bowen's room to perpetrate the deed. It is too much to believe, without some additional proof, that an attacker in furtherance of a personal feud would run the risk of breaking and entering and burglary charges, and even the risk of being shot himself by some one in the house, in addition to the danger of physical retaliation by his adversary, when it would be so much easier to accomplish the purpose under almost any other set of circumstances. It is much more probable that an intruder bent on theft in this house, would be interested in stealing from the master rather than the servant. The fortuitous circumstance that put him in the servant's room where he was intercepted, rather than in the room of a member of the family, such as that of the son directly across the hall, should not militate against the right to compensation.
Research has disclosed no case directly in point in New Jersey or elsewhere, sustaining the right of recovery. However, two cases in other jurisdictions are analogous.
In McLean's Case, 323 Mass. 35, 80 N.E.2d 40 (Sup. Jud. Ct. 1948), it appeared that at 2 A.M. the employee returned to duty as a taxi driver. He was found at 4:20 A.M. in his cab, slumped over the front seat. The engine and meter were both running. The meter read $1.80 at 4:30 A.M.
*30 There was no partition between the front and rear seats of the cab. The injuries received were consistent with having been struck from behind. A broken hammer handle was discovered in the back of the cab. A child was found playing with the rest of the hammer. The employee did not seem to have been robbed. When found, he had $36 on his person. He could offer no explanation as to what had happened.
It was held that where the evidence pointed in the direction of an assault by a passenger, proof of motive was not necessary. The allowance of compensation was sustained.
In Lippmann v. North Dakota Workmen's Compensation Bureau, 55 N.W.2d 453, 457 (N.D. Sup. Ct. 1952), a waitress was shot while going to the kitchen for dishes. The assailant committed suicide immediately. The statute only required the injury to occur in the course of the employment. However, it provided also that in "`the course of'" included:
"`Injury caused by the willful act of a third person directed against an employee because of his employment.'"
The employer argued there was no proof showing the killing was because of the employment. Compensation was allowed.
In our own State, compensation was granted to a female employee who was raped while working in a cleaning and dyeing shop, Giracelli v. Franklin Cleaners & Dyers, Inc., 132 N.J.L. 590 (Sup. Ct. 1945); to a newsboy who was sent by his employer at about 2 A.M. to make a collection of money from a newsstand a short distance away and who was accosted on the way and assaulted by five men. Gargano v. Essex County News Co., 129 N.J.L. 369 (Sup. Ct. 1943), affirmed 130 N.J.L. 559 (E. & A. 1944).
Recovery in these cases seems to have been predicated upon the theory that the place of work (in an undesirable neighborhood  Giracelli), or the nature of the work (walking on a lonely street in the early hours of the morning to make a money collection  Gargano), exposed them to the hazard of assault. In addition, in the Gargano case, although no money was taken, the Supreme Court said:
*31 "* * * It may very well be that the men who attacked him knew the type of his employment and knew or suspected that he made collections of money."
If the risk of assault is incidental to work under the conditions described in these two cases, should it not be recognized that a pretentious home in a fine residential neighborhood has a greater exposure to burglary than a shack in a tenement area? This, I think, can be accepted as a matter of common knowledge. Consequently such a risk is an incident of a live-in butler's employment and ought to be taken into account not only in evaluating the weight of the evidence here but in deciding upon the more probable hypothesis as to what took place.
Another New Jersey case which may be considered as opposed to petitioner's recovery ought to be referred to. In Giles v. W.E. Beverage Corp., 133 N.J.L. 137 (Sup. Ct. 1945), affirmed per curiam 134 N.J.L. 234 (E. & A. 1945), the evidence disclosed that at about 11:45 P.M., at about the time when there was a change in the shifts of the policemen patrolling the area and when the manager of the liquor store involved was in the process of checking the receipts for the day, two undisguised men entered the store and without saying a word, immediately shot him six times. No robbery was committed, although cash from the register was scattered about the floor and under the manager's body. Compensation was denied for lack of proof that the killing arose out of the employment. The undesirable neighborhood doctrine was argued but dismissed by the court as unproved.
Basically the absence of robbery distinguishes the case from ours. Moreover, indication exists that the present Supreme Court recognizes at least some measure of conflict between the Giles and Gargano cases. See Gargiulo v. Gargiulo, 13 N.J. 8, 11 (1953), where the court, after referring to the former, said: "But compare Gargano v. Essex County News Co., 129 N.J.L. 369 (Sup. Ct. 1943), affirmed on the opinion below, 130 N.J.L. 559 (E. & A. 1943)."
Certainty of proof that an injury was sustained by accident arising out of and in the course of employment is not required; *32 nor proof beyond a reasonable doubt; nor even clear and convincing proof. If, in the state of the evidence, the hypothesis that the injury did so arise is more probable in relation to other possible hypotheses, an award is required. Gilbert v. Gilbert Machine Works, 122 N.J.L. 533 (Sup. Ct. 1939). In such a situation, the employee has established his right to recovery by a preponderance of the evidence.
In my judgment, on the circumstances shown, the more reasonable hypothesis is that an intruder bent on burglary entered respondent's house, got into Bowen's room, was intercepted in some way, as a result of which a struggle took place, out of which the injuries arose. Accordingly, I would sustain the Division of Workmen's Compensation in allowing compensation.