47 N.J. Super. 353 (1957)
136 A.2d 67
ANTHONY PISAPIA, PETITIONER-APPELLEE,
v.
CITY OF NEWARK, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Essex County Court, Law Division.
Decided October 31, 1957.
*354 Messrs. Brass & Brass, attorneys for petitioner-respondent (Mr. Leonard Brass, of counsel).
Mr. Vincent P. Torppey, attorney for respondent-appellant (Mr. Alfred Del Negro, of counsel).
GAULKIN, J.C.C.
Pisapia was awarded workmen's compensation and his employer, the City of Newark, appeals.
Pisapia, a timid man five feet four inches tall and 62 years old, had been employed 27 years by the city in its Sanitation Department. His job was to pull garbage cans from houses to the sidewalk, where they were later picked up by trucks. On December 4, 1954, at about 5 A.M., while it was yet dark, he was working alone on Monmouth Street when he *355 was attacked from the rear, struck over the left eye, knocked down, and robbed of $3. Though bleeding, he continued to work until about 7 A.M., when his foreman came by and, seeing his condition, took him to the police station and then to the city hospital. It was for the results of this attack that he was awarded compensation.

I.
Appellant's first point is that "an assault upon an employee in the course of his employment, by an unknown assailant, for the purpose of robbing the employee of his personal funds, does not arise out of the employment." The appellant therefore contends that the Deputy erred when he held that this case comes within the positional or "but for" doctrine.
After the argument of this case before this court, the Supreme Court handed down its opinion in Howard v. Harwood's Restaurant Co., 25 N.J. 72 (1957). In that opinion the Supreme Court held that "the positional or `but for' test has been adopted in this jurisdiction." The opinion then laid down standards for the application of that test. Our task, therefore, is to assay the facts in this case upon those standards.
As Justice Burling said for the court in the Howard case:
"The analysis in each case is a two step process. We must first ascertain whether but for the fact of employment the injury would not have happened. * * * Thus establishing the positional relation of the employment to the injury we must next determine the nature of the risk involved."
The Supreme Court suggested various tests for the first step. It said we may inquire whether the employment "was a necessary antecedent in that the injured employee would not have been where he was had he not been engaged in his appointed task. * * *" Or we may ask "whether it is more probably true than not that the injury would have occurred during the time and place of employment rather than elsewhere." Or is it "more probably true than not that the injury would not have occurred under the normal *356 circumstances of every day life which exist outside of the employment. * * *"
Tested by these standards, there seems to be no doubt that the first issue presented by the Howard analysis must be resolved in petitioner's favor. Were Pisapia not at work, it is hardly likely he would have been alone before dawn on this street. More likely, at that hour of a winter's day, but for his employment, this 62-year-old man would have been at home and in bed. He could not leave the street, even if he became nervous or suspicious  his employment kept him there. Indeed, so conscientious was he that he stayed even after the attack. "His work * * * involved the making of regular rounds, thus affording opportunity * * * to observe his movements and attack from behind." Cole v. I. Lewis Cigar Mfg. Co., 3 N.J. Super. 157, 160 (App. Div. 1949), affirmed 3 N.J. 9 (1949).
For the second step, the Supreme Court said that risks may be divided into three classes: the obvious "industrial injury," such as fingers getting caught in gears; the "neutral risks," which "may be defined as uncontrollable circumstances which do not originate in the employment environment but which happen to befall the employee during the course of his employment"; and the risks "personal to the claimant," in which "it is the personal proclivities or contacts of the employee which gives rise to the harm. * * * Thus where an employee is attacked during his employment by a person whose motive is that of vengeance stemming from personal contact with the employee, the injury cannot be said to arise out of the employment. Giles v. W.E. Beverage Corp., 133 N.J.L. 137 (Sup. Ct. 1945), affirmed 134 N.J.L. 234 (E. & A. 1946). * * *" Risks "personal to the claimant" are not compensable; the other two classes are. The city contends that since the assault was for the purpose of robbing the employee, who had no money or property of the employer in his possession, the injury arose out of a risk "personal to the claimant."
The language of the Howard case would seem to put the case at bar in the category of "neutral risks," and so Pisapia *357 contends. However, says the city, since the facts in the Howard case were quite different from the facts at bar, the general language in that opinion must be read in the context of those facts. That general language, says the city, was not intended to change, but merely to state, the existing law. There were cases decided before the Howard case which dealt with situations precisely like the one at bar and those cases, says the city, settled the law against the petitioner in cases like this, and the Howard case did not change that settled law. Appellant relies principally upon Walther v. American Paper Co., 89 N.J.L. 732 (E. & A. 1916); Schmoll v. Weisbrod & Hess Brewing Co., 89 N.J.L. 150 (Sup. Ct. 1916); Giles v. W.E. Beverage Corp., supra, cited in the Howard case; and Beh v. Breeze Corp., 137 N.J.L. 431 (Sup. Ct. 1948), reversed 2 N.J. 279 (1949).
In the Walther case, Walther was a night watchman. While making his rounds, he was assaulted for the purpose of robbery by a fellow employee who knew he had been paid that day, and he died of his wounds. The court held that his death did not arise out of his employment.
The Walther case is a much distinguished and rarely followed case which probably received its coup de grace in Cole v. I. Lewis Cigar Mfg. Co., 3 N.J. 9 (1949). After referring to the case disdainfully as "a per curiam affirmance of a per curiam opinion of the former Supreme Court," Chief Justice Vanderbilt pointed out that
"* * * It would seem, however, that the fact that Walther was murdered by a fellow employee intent on robbing him should not under the doctrine of the Sanders case [Sanders v. Jarka Corporation, 1 N.J. 36 (1948)] have barred a recovery. Nor must it be overlooked that the Walther case was an early decision under the Workmen's Compensation Act, R.S. 34:15-1 et seq., N.J.S.A., handed down at a time when the act was still being strictly construed here and elsewhere. * * *"
As Judge Nimmo said in Crotty v. Driver-Harris Co., 45 N.J. Super. 75, 83 (Cty. Ct. 1957), "* * * Chief Justice Vanderbilt in his Cole opinion * * * made it quite evident that the Walther case could not and should *358 no longer be the prevailing law, even where the assailant's only purpose was to rob the co-employee," and Judge Nimmo so held. But even in its pristine vigor, the Walther case stood only for the proposition that an attack by a fellow employee for reasons personal to the attacker and the victim was not compensable. That principle still stands. What has been rejected is the idea that robbery is "personal."
In the Giles case, supra, Giles was manager of a liquor store in a "tough" section of the city known as the "Texas" section. However, the Supreme Court said there was "no proper evidence * * * to show the ratio of crime with relation to the population of the `neighborhood' as compared with like populated neighborhoods. * * * There is no basis in the proofs for the condemnation of the people of an entire neighborhood."
About 11:45 P.M., during a change in the shifts of policemen patrolling the beat on which the store was located, and while Giles was in the process of checking the receipts for the day, two men entered the store and immediately, without saying a word, shot and killed Giles. None of the cash was taken. The killers fled and were never apprehended. The Supreme Court said, "There is no proof that the assailants were frightened away. * * * Thus we have a most unfortunate killing of an employee by unknown assailants for no known motive. * * * [which] * * * without more, fails to establish * * * that the accident arose `out of' the employment." The Court of Errors and Appeals affirmed merely because "the Supreme Court, in the exercise of its fact-finding function, determined * * * that appellants had not sustained the burden of establishing that the death * * * arose out of his employment. * * *"
The Giles case was cited in the Howard case but, significantly, only for the proposition that "where an employee is attacked during his employment by a person whose motive is that of vengeance stemming from personal contact with the employee, the injury cannot be said to arise out of the employment." Obviously, Justice Burling meant to approve only the general principle which he stated, and not the *359 result reached in the Giles case upon its facts. His language appears to have been carefully chosen to bless the tree, but not the fruit. The cases since the Giles case, and the Howard case itself, indicate that were the self-same facts as appeared in the Giles case to arise today, the result would very likely be different. In any event, the Giles case is authority today for no more than the proposition for which it was cited in the Howard case.
The Giles case cited and followed Schmoll v. Weisbrod & Hess Brewing Co., supra, in which the deceased's duties were to deliver beer and collect money therefor. On a Saturday night he made a delivery in a section of Atlantic City "known to the police department as one where drunkenness, assaults with intent to kill, and murders occurred with greater frequency than in any other part of Atlantic City, and where persons who commit robbery resort." While returning to his wagon after the delivery, he was shot and killed. The court held:
"* * * the testimony utterly fails to show any motive for the attack upon the deceased. The assailant of the deceased was unknown. His motive in making the attack was also unknown. No robbery or attempt at robbery was shown. The person who shot the deceased might have shot him out of revenge for some fancied wrong or by mistake or by accident. There was no proven fact or circumstance before the court below that connected the shooting either directly or indirectly with the employment of the deceased, either as driver or collector."
Obviously, the authority of the Schmoll case has been greatly weakened, if not indeed destroyed, by later cases such as Gargiulo v. Gargiulo, 13 N.J. 8 (1953), and the Howard case, but at its strongest Schmoll, as well as Giles, stood only for the proposition that when the employee was able to prove no more than that he was attacked for an unknown motive, the injury was not compensable. The Giles and Schmoll cases, therefore, have no bearing on the case at bar because in this case we do know the motive of the assailant. It was robbery. The attack was not due, in the words of the Howard case, to "the personal proclivities or *360 contacts of the employee. * * *" The attacker here had no personal grudge against Pisapia. He would have robbed any other elderly person in that street at that hour, just as the rapist in Giracelli v. Franklin Cleaners & Dyers, Inc., 132 N.J.L. 590 (Sup. Ct. 1945), would have raped any reasonably feminine woman at that time and place. The robber here was almost as impersonal as the insect in City of North Wildwood v. Cirelli, 129 N.J.L. 302 (Sup. Ct. 1943), affirmed 131 N.J.L. 162 (E. & A. 1944), which would have bitten any person with an equal expanse of nakedness. There was nothing "personal" in the attack in the case at bar, within the meaning of the Giles, Schmoll and Howard cases.
Pisapia, on the other hand, relies heavily upon Gargano v. Essex County News Co., 129 N.J.L. 369 (Sup. Ct. 1943), affirmed 130 N.J.L. 559 (E. & A. 1943). In that case Gargano distributed newspapers and collected money therefor. On a Sunday, at 2 A.M., he left his employer's premises "to make a collection of money from a news stand, a short distance away." While walking from his employer's premises to the newsstand he was set upon by five men who beat and stabbed him. The Burean held that there was insufficient evidence to show an attempted robbery or that the injuries were sustained in the defense of the employer's property. The Court of Common Pleas held that the evidence was sufficient to sustain a finding of an assault committed with intent to rob, and further that, whether there was attempted robbery or not, the incident grew out of his employment and constituted an accident arising out of and in the course of such employment.
The Supreme Court said (129 N.J.L., at page 371):
"We concur in the holding of the Common Pleas. * * *

* * * * * * * *
`If the danger was one to which the employee was exposed because of the nature of his employment, the accident arose out of the employment. It is in this category if there be a causal relation between the injury and the conditions under which the work is required to be done. The service is then a contributing proximate cause; the injury is traceable to a hazard of the employment. It *361 need not have been foreseen or expected; it suffices if the injury flowed as a rational consequence from a risk connected with the employment.'
Tested by this standard, we think the defendant suffered an accident arising out of his employment. The nature of his employment caused him to be walking on foot through a lonely street at a late hour. The evidence is clear that his assaulters were the aggressors whether their motive was to commit a robbery or not. It may very well be that the men who attacked him knew the type of his employment and knew or suspected that he made collections of money. Whether that be so or not, we think the risk grew out of the character of the employment in that his employment required him to be where he was at that hour of the night under the conditions then existing at that place. The danger was one to which he was exposed because of the nature of his employment."
In 1955 Judge (now Justice) Francis pointed out that "indication exists that the present Supreme Court recognizes at least some measure of conflict between the Giles and Gargano cases." Bowen v. Olesky, 37 N.J. Super. 19, 31 (App. Div. 1955), affirmed 20 N.J. 520 (1956). That there is a conflict between the cases is obvious. No case that I know of, reported since 1955, has resolved the conflict, reconciled the cases, or expressly held which is to be followed. When such a showdown comes, the Gargano case seems more likely to survive, but we need not resolve that conflict in this case, because in the Gargano case it was uncertain what the motive of the assailant was. Any argument that the Gargano rule is not the correct one when the assailant's motive is unknown is beside the point here, for here we know the motive was robbery. Hence everything said by the court in the Gargano case can be accepted as authority in this case without reservation.
Pisapia's counsel argues that the area in which the attack took place is one in which there is more criminality than elsewhere in the city and, therefore, the employee's risk was increased by working there. The city correctly points out that no evidence of this was offered, to which petitioner replies that the "Third Ward" is so well known that this court should take judicial notice of its character. Not so. However, it does not seem to me that it is a necessary part of the employee's case to prove such increase of hazard.
*362 1 Larson, Workmen's Compensation Law, sec. 9, pp. 73-74 (1952), discusses "The Street-Risk Doctrine." Under section 11.11(c), p. 115, the author says:
"The `street-risk' doctrine as applied to assaults is another common application of the general rule granting compensation when the assault arises out of a risk associated with the situs of the work. And just as the majority of street-risk cases now are based on the actual-risk rather than the increased-risk test, so the same broad standard is applied to assaults upon those whose work takes them upon the highway. Highway robbery is perhaps the most common fact situation to which this rule is applied, since, as one court pointed out, `its name indicates that it is a danger incident to, connected with, and "arising out of" the use of highways.' Note that in these cases the exposure to the risk on the highway is in itself enough to establish the causal connection; there need be no evidence of carrying the employer's money or of protecting his property."
See also Geltman v. Reliable Linen & Supply Co., 128 N.J.L. 443, 449 (E. & A. 1942); Bobertz v. Board of Education of Hillside Tp., 134 N.J.L. 444, 448 (Sup. Ct. 1946), reversed 135 N.J.L. 555 (E. & A. 1947).
It is interesting to note that the Giles case itself recognized Gargano as a "street-risk" case. At page 142 of 133 N.J.L. the Supreme Court said:
"The Geltman, Gargano and Giracelli cases are clearly distinguishable. In the Geltman case, as in the Gargano case, there was invoked the risk or hazard to the employee incident to his use of the highway in the pursuit of his employer's business. * * *"
The city cites Beh v. Breeze Corp., supra. That case also recognized robbery as a street risk. Beh, a travelling salesman, had been killed by a hitch-hiker whom he picked up. The old Supreme Court (Justices Bodine and Jacobs) granted compensation, saying (p. 433):
"We find that the death arose from a risk incidental to the employment and was causally connected therewith because it arose from a risk or hazard incident to the use of the highway. The employee, if he had not stopped for the hitch-hiker, might have been shot any way. That is one of the risks of travel."
*363 The Beh case was reversed in 2 N.J. 279, but only on the ground that picking up the hitch-hiker "was entirely outside the employment."
For the foregoing reasons it is concluded that Pisapia's accident arose out of his employment.

II.
The city's second point is that Pisapia is not entitled to compensation because in November 1955 he retired on a pension under R.S. 43:4-1 et seq. (1944) as a veteran with 20 years' service. The city cites as controlling N.J.S.A. 34:15-43 (1956), which provides in part:
"No former employee who has been retired on pension by reason of injury or disability shall be entitled under this section to compensation for such injury or disability; provided, however, that such employee, despite retirement, shall, nevertheless, be entitled to the medical, surgical and other treatment and hospital services as set forth in section 34:15-15 of the Revised Statutes." (Emphasis added)
Obviously the language of this statute does not apply to the case at bar, because Pisapia was not retired "by reason of injury or disability," but by reason of age and service.
Granting that, the city argues that it is against public policy for a municipal employee to receive both a pension and workmen's compensation, citing DeLorenzo v. Board of Com'rs of City of Newark, 134 N.J.L. 7 (E. & A. 1946); Breheny v. Essex County, 136 N.J.L. 524 (E. & A. 1948); Pirher v. Bd. of Public Works of South River, 35 N.J. Super. 193 (Cty. Ct. 1955), affirmed 37 N.J. Super. 482 (App. Div. 1955); and Flynn v. Union City, 32 N.J. Super. 518 (App. Div. 1954). None of these cases is in point. In the DeLorenzo case, DeLorenzo applied for a pension in 1930 pursuant to L. 1923, c. 103, for age and service. The city denied it in 1931. In 1932 DeLorenzo was injured and received compensation for total and permanent injury, which was being paid when the suit was started. In 1940 he made application for a pension again "from April, 1932," the date *364 of his injury. The court held that while receiving compensation DeLorenzo was still an employee and while still an employee he could not receive a pension. Therefore, the court affirmed the judgment below which had held that "the application for the pension was properly denied because it was prematurely made, the plaintiff not having terminated his relationship to his employer under the Workmen's Compensation Act." The decision further is based upon laches and waiver. Nowhere does the case say that it is against public policy for one to receive both a pension and workmen's compensation.
As a matter of fact, in Eckert v. New Jersey State Highway Department, 1 N.J. 474, 478 (1949), the court said:
"Appellant correctly states there is no legislative authority expressly permitting payment of both pension and compensation benefits but on the other hand there is no legislative prohibition against such payments and there appears to be legislative sanction therefor, if not explicitly, at least inferentially."
Very likely the Supreme Court there had reference to dependents rather than to the employee himself, but the language is apt here because here also there is no legislative prohibition against such payments, except to the employee who has been retired on pension for reason of injury or disability, and at least inferentially that means if he was not so retired, he may receive compensation.
Again, as the Supreme Court said in the Eckert case:
"The language of R.S. 34:15-43 is plain, clear and unambiguous. It is elementary that the intent of the Legislature is to be gleaned from the language of the statute and that Courts cannot arbitrarily expand the scope of a statute beyond the plainly expressed legislative intent."
To paraphrase Eckert, a judicial expansion of the act to exclude those retired for age and service would amount to judicial legislation, and constitute an exercise of the legislative function by the court. As the court concluded in the Eckert case (p. 480):
*365 "It is said, and may be argued, that a pension paid by the State being in the nature of a gratuity it is against public policy to allow benefits in addition thereto from another source payable by the State. The Legislature is the arbiter of the public policy of the State, that is solely its prerogative with which, when declared, the Courts have no concern except to see it kept within constitutional bounds."
In Loges v. Town of Newton, 5 N.J. Super. 433 (App. Div. 1949), affirmed Kays v. Town of Newton, 4 N.J. 356 (1950), it was held that a volunteer fireman could recover workmen's compensation from a municipality in whose service he was injured even after he had retired as a county employee on a pension by reason of that injury. If the public policy exists which the city claims, would Loges have been permitted to recover?
Breheny v. Essex County, supra, is not in point because, while in that case both the pension and the compensation were for disability, the case was decided on considerations of res adjudicata. In Flynn v. Union City, supra, the retirement and the compensation were for the same disability, and the pension was granted before the award for compensation, which brought the case squarely within the language of R.S. 34:15-43 and Reinhold v. Town of Irvington, 134 N.J.L. 416 (Sup. Ct. 1946). In Pirher v. Bd. of Public Works of South River, supra, Pirher sought both compensation and retirement for the same disability.
It is therefore my conclusion that Pisapia is entitled to recover compensation for his injury in spite of the fact that he was pensioned for age and service in November 1955 while the workmen's compensation proceedings were pending.

III.
The appellant's remaining points are that the award of 25% of total is excessive and that appellant should not have been charged with the bills of the Fair Oaks Sanatorium. These two points may be disposed of together.
Appellant's Dr. Bergman testified that, although he agreed Pisapia is now totally disabled, only 10% of the total was *366 "by reason of a concussion, scalp laceration, (and) post-traumatic neurosis, causally related to the trauma. * * *"
The testimony of Pisapia's Dr. Farb is not clear:
"Q. Just one more question.
You say he is totally disabled from what causes, what actually are the causes that you think he is totally disabled from, is it a mental condition or just what? A. Yes, I would exclude him from working, based on his mental condition, but also now on the other symptoms of old age, such as a man of his age has."
If Dr. Farb meant to exclude "the other symptoms of old age" which Pisapia "now" has, he did not state what percentage of his total disability should be excluded. Appellant therefore argues that since Dr. Bergman's 10% is the only estimate given in the testimony and no one except the deputy mentioned the figure of 25%, this court must find the disability to be 10% and no more. Not so. Upon all of the testimony the deputy was justified in concluding that the disability is 25% of total.
The testimony proves that after the attacker fled, Pisapia continued to work until about 7 A.M. when his foreman, making his rounds, saw Pisapia's injury and the blood on his clothes. The foreman took him first to the police station and then to the hospital, where his wounds were noted as "injury over left eye and laceration of forehead" and sutured. Dr. Bergman found the resulting scar to be 1 1/2 inches long.
Pisapia then was sent to the city's Dr. Friedman for treatments for one week, and on December 13 he went back to his work. He worked regularly until February 13, 1955. From February 14 to April 6 he stayed home. On April 7 he returned to work and worked until May 1. Since that date he has been unable to work. Prior to the injury he had worked for the City of Newark steadily for 27 years.
After Dr. Friedman's treatments, Pisapia went to his own Dr. Insabella. Dr. Insabella submitted reports to the city to obtain sick leave. He reported that from February 14 to March 9 he treated Pisapia for herpes zoster or "shingles."
*367 Pisapia's next doctor was Dr. DeVivo, who reported to the city, for the same purpose, that Pisapia "has been under my care from 14 March. He is suffering from marked nervousness and the shingles. At present he is improved and may return to work on 24 March." But on April 1 Dr. Insabella again reported and said that Pisapia was "under my care for herpes zoster  severe and post herpes anorexia and mental depression. No work for 2 months." (Emphasis the doctor's)
Nevertheless, Pisapia apparently went back to work April 7 and worked until May 1. On April 27 Dr. Insabella reported that Pisapia would be under his care for herpes zoster from April 3 to May 4; on May 5 he extended it to May 18, and on May 19 to June 1.
Although no further doctor's certificates were submitted to the city until August 30, 1955, the city continued to pay sick leave from June 1 until August 30 on the basis of the "sick slips" which had been previously submitted.
In the meantime however, on May 26, 1955, Dr. Farb, a psychiatrist, had been consulted by the family. He testified:
"I was called to the home on May 26th, 1955, because the patient could no longer be managed by the family. I got a history that several months before while at work the patient had been assaulted or been hit on the head, and since then the family explained that his personality had changed so much that he became suspicious, afraid, would not go out of the house, would not let his wife go out of the house. They felt this had gone so far that they thought they couldn't handle him themselves."
This history was substantially in accord with the testimony. For example, Pisapia's son, who lived in the same building with his father and saw him every day, testified that after the robbery his father was nervous and depressed, afraid to go to work, and often he had to take him to work and stay with him "until it got light."
After examining him on May 26, Dr. Farb made a diagnosis of "organic mental syndrome" and immediately committed him to Fair Oaks Sanatorium "for his own safety and for the safety of the family." He stayed there until June 24, 1955, at a cost of $648.51.
*368 The Fair Oaks' record of admission shows that:
"Patient was brought in by his wife, his sons, and sons-in-law, and was seen sitting in the car because his family had difficulty getting him to come in. He is extremely retarded, apprehensive and looks depressed, is trembling and appears distressed. He does not respond to questions and was finally helped out bodily and was brought directly to his room."
After a description of the robbery, the record continued:
"He received three stitches over the eye and after staying home for about a week he went back to work. There was a definite change in his behavior, however. He would just sit in the kitchen all day long, when he wasn't working, and didn't feel like doing anything. Every morning he was afraid to go to work and complained that his legs were getting weak after an hour's work. Three to four weeks after the incident he developed shingles over the right side of his thorax, was treated at home with injections but never complained about pain and remained very quiet. After he was back to work for two days he claimed that he couldn't do it and that his legs won't carry him. His appetite remained good for a while but he was unable to sleep and three weeks ago, at the suggestion of his physician, he was seen by Dr. Loeser, who put him on Thorazine, which patient took only irregularly. He was restless, paced the floor and at every noise he thought that somebody was coming to take them all away. There were other fears. He was afraid that the oil tank in the cellar would explode and that the house would explode if the gas was lit. He was in the first world war and now he talked about the Germans and warned everybody that they would be shot. He didn't talk about present-day things, but his memory is good and he talks sensibly at times. For the last several days he went without eating or sleeping and even refused water."
The "Discharge Note" says:
"June 24, 1955  Patient received a total of 10 treatments. In the beginning of his stay he was mute, refused food and seemed apprehensive and depressed. As treatment progressed he became friendly and there were no difficulties, but conversation was still limited, on his part, to a shaking or nodding of his head, probably because of an organic reaction. He appeared, however, friendly and happy and participated in activities. He was discharged, improved, into the care of his family."
Dr. Farb did not see him again from May 26 until October, 1955, when he found his condition to be generally unchanged; *369 but he did notice then for the first time that Pisapia's tongue deviated to the right and the right corner of his mouth drooped  "evidence of some brain damage," said Dr. Farb.
In March 1956 Dr. Farb saw him again. Dr. Farb testified:
"Here again he had a recurrence of the original condition, and since the past several weeks prior to this visit he refused to go out of the house. He awakened during the night when he heard sounds on the street and thought people were coming in to beat him up again, to be harmed. He feared that harm would come to the family. He was very frightened, having been hurt that time, and he thought perhaps whoever had hurt him was coming back to do harm to him again. He was talking about that all the time, how he was hurt, and they are going to get him again.
Q. This is all through the times you saw him? A. Yes, these fears really became frozen. He couldn't be convinced that this was not so. He could think of nothing except that they were going to harm him, and perhaps the family too."
In October 1956 another acute episode made it necessary to take Pisapia to Fair Oaks again. He was discharged from Fair Oaks in November 1956 and now seems improved. His son testified "now he leaves the house," and at the time of the hearing the son said his father was better than he had been at any time since the accident  almost "normal."
Dr. Farb testified that the trauma was the cause of the organic mental syndrome. He said:
"We have reason to believe that there was a certain amount of brain damage, perhaps not very gross, but still present to account for the change in his personality. Sometimes this damage takes the form of very small bleeding, small areas of bleeding, and perhaps silent areas, because this happened directly after the accident, because his change of personality was gradual and was a continuation of the incidents of the accident, I feel that I am justified in assuming that the accident was the cause, and that the present condition was the effect. * * * If we have a man who is working regularly and gets paid for his work and does a certain amount of work satisfactorily, we feel that whatever underlying condition there might have been might not have been sufficient to interfere with his work. If this condition is aggravated by an injury, then we have a new condition.
Q. It may have been an underlying condition which was aggravated, or it may be a condition which was precipitated by this trauma, is that what you mean? A. Yes." *370 As to the son's testimony that his father appeared to be normal, Dr. Farb replied:
"That's not unusual. In three months from now he might have another fit. That might be periodic from here on. According to my records about every six months he had to be treated, you know. That's no reason to think it will change from here on."
In addition to the ailments mentioned above, Pisapia has arteriosclerosis, hypertension and asthma. The asthma developed, as did the herpes zoster, after the robbery and has not been shown to have been caused by the accident. The arteriosclerosis and hypertension, of course, were pre-existing conditions.
Based upon the foregoing considerations, I concur with the view of the deputy that "while he is totally disabled, his disability includes not only the residuals of the accident, but the asthmatic condition which was unrelated, the involutionary psychotic changes which are brought by the hazards of old age, the arteriosclerosis and the hypertension. For the residuals from the accident per se, I will award him 25 per cent of partial total."
Turning now to the bills of Fair Oaks, which the Deputy ordered appellants to pay, we note that the claim petition was filed in June 1955, after the first but before the second stay in Fair Oaks. In its answer the city denied "that the petitioner met with an accident arising out of and in the course of his employment. * * *" Beginning with Dr. Insabella's report of August 30, all the reports to the city thereafter stated that Pisapia was being treated for "a nervous disorder" or "anxiety neurosis." The city's Dr. Bergman testified that in October 1955 he told the city that Pisapia was unemployable and depressed and that, while he did not believe more than 10% of Pisapia's condition was caused by the trauma, "... considerable litigation will ensue as to causal nexus * * * since he met with a shocking accident, I suggested some disposition. * * *" The city, nevertheless, did not amend its answer or otherwise act on Dr. Bergman's recommendation, but stood by its contention *371 that petitioner did not meet with a compensable accident  a clear indication that if the city had been asked for hospitalization or medical treatment it would have been refused. Under such circumstances the demand would have been an idle formality, which the law does not require. Bobertz v. Township of Hillside, 126 N.J.L. 416, 417 (E. & A. 1941); D'Amico v. General Elec. Supply Co., 16 N.J. Super. 472 (Cty. Ct. 1951), affirmed 22 N.J. Super. 199 (App. Div. 1952), affirmed 12 N.J. 607 (1953).
Futhermore, as to the confinement in May 1955 before the claim petition was filed, it appears that that was an emergency. Dr. Farb committed Pisapia to Fair Oaks immediately after his examination, for his safety and the safety of his family. There was no time for prior consultation with the city, which apparently would have been fruitless anyway.
The city argues that since the deputy found Pisapia only 25% disabled, and the hospital diagnosed his condition as involutional psychotic reaction which the Deputy found was not related to the accident, the city should pay no more than 25% of the bills. However, Dr. Farb testified, and I find, that it was the trauma, superimposed upon Pisapia's underlying condition, that set off the acute episodes that required hospitalization, and hence the city is responsible for the entire cost. That is not inconsistent with the findings that, the acute episodes having passed, Pisapia's present disability is 25% of total.
A judgment in accordance with the foregoing may be submitted.